1  **Paul E. Rice/Bar No. 062509**
   **RICE & BRONITSKY**
2  350 Cambridge Avenue, Suite 225
   Palo Alto, CA 94306
3  Telephone:    650/289-9088
   Facsimile:    650/289-9093
4  price@civlit.com

5  Attorneys for Plaintiff
   B&O Manufacturing, Inc.
6

7

8              **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10             **SAN FRANCISCO/OAKLAND DIVISION**

11

12  **B&O MANUFACTURING, INC.,**              Case No.: C 07-02864 JSW

13              Plaintiff,                     **SECOND AMENDED COMPLAINT**
                                              **FOR BREACH OF CONTRACT,**
14        v.                                   **RESCISSION, RESTITUTION, AND**
                                              **DECLARATORY RELIEF**
    **HOME DEPOT U.S.A., INC.,**
15
              Defendant.
16
                                              **DEMAND FOR TRIAL BY JURY**
17

18  **COMES NOW** Plaintiff, and demanding trial by jury, alleges as follows:

19                        **GENERAL ALLEGATIONS**

20      1.   Plaintiff, B&O Manufacturing, Inc. ("B&O"), is a California corporation, whose principal

21  place of business is South San Francisco, California.

22      2.   Defendant, Home Depot, U.S.A., Inc. ("HD"), is a Delaware corporation, whose principal

23  place of business is Atlanta, Georgia.

24                            **JURISDICTION**

25      3.   The Court has jurisdiction of this Complaint, pursuant to 28 USC 1332, as the parties are

26  citizens of different states and the amount in controversy exceeds $75,000.

27      4.   Further, pursuant to a contract entered into by B&O and HD on or about April 5, 2005, the

28  parties agreed that any litigation arising out of said contract, which this lawsuit does, shall be brought

RICE & BRONITSKY
350 Cambridge Avenue, Suite 225
Palo Alto, CA 94306
650/289-9088

RICE & BRONITSKY
350 Cambridge Avenue, Suite 225
Palo Alto, CA 94306
650/289-9086

1  only in the United Stated District Court for the Northern District of California.  A true and correct

2  copy of said contract, sans attachments, is attached hereto as Exhibit 1.  Plaintiff has not attached said

3  attachments as, inter alia, they contain pricing information that B&O believes HD may consider

4  confidential.

5       Additionally, Plaintiff sues on another written contract, Exhibit 3 (infra), which contains, at

6  Section 17.0, a forum selection clause that purports to establish venue in the United States District

7  Court for the Northern District of Georgia, or the Superior Court of Cobb County, Georgia.

8  Defendant apparently contends, by referencing Exhibit 3 in its Motion to Dismiss Counts Two and

9  Three of Plaintiff's First Amended Complaint, at Memorandum pp. 3:1-3, 8:5-6, and 8 at footnote 6,

10  that the relationship between the parties, pursuant to Exhibits 1 and 2, is affected by the existence of

11  Exhibit 3.  Judicial economy, the potential for inconsistent results, and the related case doctrine

12  suggest that all claims for relief arising out of Exhibit 3 be heard in this one action in the Northern

13  District of California.

14  **VENUE**

15     5.  Venue is proper in the Northern District of California under 28 USC 1391(a), in that a

16  substantial part of the events or omissions giving rise to Plaintiff's claims occurred in said District.

17  **FIRST CLAIM FOR RELIEF (BREACH OF CONTRACT)**

18     6.  Pursuant to Exhibit 1, Section 1.a., HD agreed to purchase from B&O, not later than May 15,

19  2005, 72,000 split curtain safety netting systems.

20     7.  HD has breached said contract by purchasing substantially less than 72,000 split curtain

21  safety netting systems by May 15, 2005, all to Plaintiff's damage, according to proof.

22     8.  Pursuant to Exhibit 1, Section 1.e., HD agreed to purchase all orange netting then owned by

23  B&O at specified prices.

24     9.  HD has further breached said contract by failing to purchase all orange netting then owned by

25  B&O at specified prices, all to Plaintiff's damage, according to proof.

26     10. Pursuant to Exhibit 1, Section 1.c., HD was obligated to advise B&O of the identity of

27  suppliers of safety netting products similar to Plaintiff's safety netting products, located in the State

28  of California, and of the location of the stores in which said similar products were located.

2

1    11. HD has further breached said contract by failing to so advise B&O, all to Plaintiff's damage,

2  according to proof.

3    12. Plaintiff has at all times been in compliance with its material obligations under said contract.

4  **WHEREFORE,** Plaintiff prays judgment as follows:

5             **SECOND CLAIM FOR RELIEF (RESCISSION AND RESTITUTION))**

6    13. Plaintiff incorporates by reference, as though set forth in full, paragraphs 1 through 5, above.

7    14. For approximately the past thirteen years, Defendant has been, cumulatively, by far,

8  Plaintiff's biggest customer. Its continued purchases from Defendant have been critical to Plaintiff's

9  financial success.

10    15. On or about January 31, 2006, while Michael Calleja, B&O's president, was at HD's facilities

11  in Atlanta, Georgia, HD required Mr. Calleja, without allowing B&O, through Mr. Calleja, the

12  opportunity to consult with legal counsel, to immediately prepare and sign, on Plaintiff's letterhead, a

13  letter agreement regarding a commitment to pay to HD sums not actually owing to it. A true and

14  correct copy of said letter agreement is attached hereto as Exhibit 2. Said letter agreement served to

15  modify Exhibit 1. As a modification to Exhibit 1, the forum selection and choice of law provisions

16  contained in Section 4 of Exhibit 1 are equally applicable to Exhibit 2.

17    16. Exhibit 2, by virtue of a margin notation, indicates that it was approved by HD's legal

18  department.

19    17. On information and belief, HD's in-house legal department participated in the process of HD

20  coercing B&O into executing said Exhibit 2, based upon the threat that if B & O did not execute said

21  document, HD would abruptly cease all future business dealings with B&O, and conversely, by

22  promising that if it did sign Exhibit 2, B&O would continue to receive substantial quantities of

23  business from HD in the future.

24    18. Although B&O had no direct discussions with HD's legal department, on information and

25  belief, the persons acting on behalf of HD concerning the execution of Exhibit 2, who were not

26  employed within HD's legal department, acted as agents of HD's legal department in communicating

27  with B&O. HD and its legal department were well aware that B&O was represented by counsel with

28  respect to the negotiation and execution of Exhibit 1 and all payments related thereto based, inter alia,

RICE & BRONITSKY
350 Cambridge Avenue, Suite 225
Palo Alto, CA 94306
650/289-9088

3

SECOND AMENDED COMPLAINT

1  on the participation by B&O's counsel in drafting Exhibit 1, and further, by the fact that B&O's

2  counsel traveled to HD's headquarters in Atlanta, Georgia, for a meeting that ultimately resulted in

3  the execution of Exhibit 1, after extensive negotiations of the terms thereof by counsel for B&O and

4  counsel for HD.

5      19. This indirect contact with B&O by HD's legal department, under the facts and circumstances

6  surrounding the execution of Exhibit 2, was a violation of well established rules of professional

7  conduct prohibiting direct or indirect communication with a party known to be represented by another

8  lawyer, absent the consent of the other lawyer.  Such conduct is prohibited, for example, by

9  California Rules of Professional Conduct, Rule 2-100; State Bar of Georgia Rules of Professional

10  Conduct, Rule 4-2; and the American Bar Association Model Rules of Professional Conduct, Rule

11  4.2.

12      20. At the time of signing Exhibit 2 on behalf of B&O, and for many months thereafter, Michael

13  Calleja was unaware of the provisions of all or any of the above referenced Rules of Professional

14  Conduct, and of their applicability to his execution of Exhibit 2.

15      21. By virtue of the violation of one or more of said Rules of Professional Conduct, Exhibit 2 was

16  and is an illegal contract against public policy, and was and is, therefore, void *ab initio*. B&O is

17  therefore entitled to a rescission of any contractual obligations that might otherwise exist pursuant to

18  Exhibit 2, and to restitution of all amounts paid by it to HD thereunder.

19      22. Alternatively, by virtue of the duress, and/or threats, and/or the violation of the Rules of

20  Professional Conduct referenced above, said contract is voidable, and B&O is entitled to a rescission

21  of any contractual obligations that might otherwise exist pursuant to Exhibit 2, and to restitution of all

22  amounts paid by it to HD thereunder.  Any delay by B &O in demanding restitution was excused by

23  virtue of B&O's continuing dependence on HD for its economic survival, and its inability to

24  promptly demand rescission without the likely prospect of severe financial hardship, and further, of

25  the lack of knowledge of B&O of the provisions of all or any of the above referenced Rules of

26  Professional Conduct, and of their applicability to its execution of Exhibit 2.

27  **WHEREFORE,** Plaintiff prays judgment as follows:

28              **THIRD CLAIM FOR RELIEF (PROMISSORY ESTOPPEL)**

RICE & BRONITSKY
350 Cambridge Avenue, Suite 225
Palo Alto, CA 94306
650/289-9088

4

1    23. Plaintiff incorporates by reference, as though set forth in full, paragraphs 1 through 5 and 17,

2    above.

3    24.  HD's promises and representations to B&O of substantial quantities of business in the future

4    were promises that HD knew, or should have known, B&O would be reasonably induced to rely upon.

5    25. B&O reasonably and foreseeably relied on said promises and representations, to B&O's

6    detriment, in that, among other things, despite B&O having executed Exhibit 2, HD did not provide

7    B&O with substantial quantities of business in the future.

8    26. The long term course of dealing between B&O and HD, both merchants under the

9    Commercial Code, established the pricing, term, description, timing of purchases, and quantity of the

10   substantial quantities of business to be provided by B&O to HD in the future.

11   27. As a result of B&O's reasonable and foreseeable reliance on said promises and

12   representations, Plaintiff has been damaged in an amount not yet determined, according to proof.

13   **WHEREFORE**, Plaintiff prays judgment as follows:

14                    **FOURTH CLAIM FOR RELIEF (DECLARATORY RELIEF)**

15   28. Plaintiff incorporates by reference, as though set forth in full, paragraphs 1 through 5, above.

16   29. This claim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

17   30. On or about June 2006, the parties entered into a written contract with a stated effective date

18   of April 1, 2006.  A true and correct copy of said contract, redacted to delete pricing information, is

19   attached hereto as Exhibit 3.  B&O has redacted said pricing information, as HD has stated that it

20   considers said information to be confidential.

21   31. Section 17.0 of Exhibit 3 requires that as a condition precedent to the filing of an action,

22   except for actions seeking injunctive or equitable relief, the parties shall first submit any disputes to

23   mediation.  As B&O seeks declaratory relief, which is an action in equity, and further, as Plaintiff, by

24   email dated July 26, 2007, has invoked the mediation provision, which invocation has been stated by

25   HD to be premature, which B&O disputes, mediation is either not required, or any right to require

26   such has been waived by HD.

27

28

RICE & BRONITSKY
350 Cambridge Avenue, Suite 225
Palo Alto, CA 94306
650/289-9088

5

RICE & BRONITSKY
350 Cambridge Avenue, Suite 225
Palo Alto, CA 94306
650/289-9088

32. On July 25, 2007, HD sent to B&O a letter purporting to exercise the right to terminate Exhibit 3, without cause, upon sixty days' written notice, pursuant to Section 3.1(b) of Exhibit 3. By sending said notice, HD has indicated its belief that it has a right to so terminate Exhibit 3.

33. Section III of Exhibit A-1 to Exhibit 3 by its terms "controls and governs" in the event of any conflict or discrepancy between it and the terms of the main body of Exhibit 3. B&O contends that the language referencing "volume commitment" in Section III of Exhibit A-1, which language, like the remainder of the language of Exhibit 3, was drafted solely by HD, and which requires HD to purchase 75% of new store safety netting within a specified time period, prohibits HD from terminating Exhibit 3 without cause, as to "new store safety netting" until "new store safety netting" purchases total 75% of said purchases made by HD within the "dates specified above."

34. Further, and additionally, B&O contends that in the event of early termination by HD, without cause, of new store safety netting purchases prior to purchases by HD totaling said 75%, B&O is entitled to a retroactive modification of the discounted pricing structure provided to HD for all products referenced in the redacted portion of Exhibit 3, to reflect the non-discounted pricing paid by HD to B&O prior to the effective date of Exhibit 3. On information and belief, HD contends that said retroactive modification should not be applied.

35. Therefore, there exists an actual controversy between the parties as to whether HD has a right to early termination without cause of Exhibit 3, as referenced above, and further, as to whether a retroactive modification of the discounted pricing structure should be applied, as referenced above.

**WHEREFORE,** Plaintiff prays judgment as follows:

### FIFTH CLAIM FOR RELIEF (BREACH OF CONTRACT)

36. Plaintiff incorporates by reference, as though set forth in full, paragraphs 1 through 5 and 31 through 35, above.

37. HD has materially breached said Exhibit 3 by not purchasing from B&O 75% of new store netting within the specified time period, all to B&O's damage, according to proof.

38. Plaintiff has at all times been in compliance with its material obligations under said contract.

**WHEREFORE,** Plaintiff prays judgment as follows:

1. For damages according to proof;

SECOND AMENDED COMPLAINT

1    2.  For interest;

2    3.  For Rescission of Exhibit 2, and Restitution by Defendant to Plaintiff of all sums paid

3    thereunder;

4    4.  For Declaratory Judgment as referenced in paragraph 36, above

5    5.  For costs of suit; and

6    6.  For such other and further relief as the Court may deem proper.

7

8    **Demand for Jury Trial**

9

10   Dated: August 3, 2007

11                                                     **RICE & BRONITSKY**

12

13                                           By _____

14                                                     Paul E. Rice
                                                     Attorneys for Plaintiff
15                                                   B&O Manufacturing, Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28

RICE & BRONITSKY
350 Cambridge Avenue, Suite 225
Palo Alto, CA 94306
650/289-9088

SECOND AMENDED COMPLAINT

# EXHIBIT 1



# ORIGINAL

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding is intended to clarify the mutual understanding between **Home Depot U.S.A., Inc.** ("Home Depot") and **B&O Manufacturing, Inc.** ("B&O") with regards to their continuing business relationship.

Both parties agree that:

1. Home Depot Commitments

    a.  Home Depot agrees to issue purchase orders for 72,000 units of the split curtain safety netting systems described in Exhibit A, at the prices referenced in said Exhibit A, plus sales tax and freight charges ("Products") by no later than May 15, 2005, provided B&O confirms that it is able to deliver such products in substantial compliance with the Schedule set forth in Exhibit A. Prior to delivery of the first 12,000 units, Home Depot shall make prepayment in full for said units. Payment for all other units shall be made pursuant to the terms of the then applicable Expense Buying Agreement, but not to exceed thirty days from each shipment by B &O.

    b.  During calendar year 2005 and through March 31, 2006, Home Depot agrees that B&O will receive orders representing no less than fifty percent (50%) of Home Depot's requirements for safety netting systems, in new and remodeled stores, at the prices referenced in said Exhibit A, plus sales tax and freight charges. Payment shall be made pursuant to the terms of the then applicable Expense Buying Agreement, but not to exceed thirty days from each shipment by B &O.

    c.  Home Depot will promptly identify in writing to B&O those suppliers from which it purchases safety netting products similar to the Products for use in its stores, when it first becomes aware of the identity of any such supplier. Additionally, whenever Home Depot becomes aware of the installation of safety netting products similar to the Products in any Home Depot store located in the State of California, Home Depot shall use commercially reasonable efforts notify B&O in writing of the location of each such store. Notwithstanding the previous sentence, B&O acknowledges that third parties install safety netting on behalf of Home Depot, and Home Depot may not be aware of the locations where third party safety netting may be installed.

    d.  Home Depot agrees and acknowledges that it has no intellectual property ownership or rights in the Products referenced in Exhibit A, or in any patents on said Products, and shall, upon the request of B&O promptly execute such documents as are reasonably request by B&O to confirm such, and further to quitclaim, assign and transfer any rights it might have therein, if any, to B&O, and or Michael J. Calleja, as directed by B&O.

     e. Home Depot shall purchase all orange netting currently owned by B&O at the price referenced in Exhibit A. Home Depot may direct B&O to utilize said netting in the manufacture of the safety netting systems referenced in 1.a. and 1.b. above.

2. <u>B&O Commitments</u>

     a. B&O shall supply Home Depot the Products on a non-exclusive basis.

     b. The Products will meet or exceed industry standards for quality and will be shipped on time in compliance with the mutually agreed upon shipping schedule indicated on each Home Depot purchase order.

     c. B&O will execute the Release attached to this memorandum as <u>Exhibit B</u> and the Expense Buying Agreement attached as <u>Exhibit C</u>.

3. <u>Controlling Documents</u>. In the event of a conflict between the terms of this Memorandum and the terms of the Expense Buying Agreement, the terms of this Memorandum will control in all respects. This Memorandum and the attached Exhibits constitute the entire agreement between the parties with respect to the subject matter herein, except that nothing contained in the Expense Buying Agreement or otherwise, shall either preclude B&O or Michael J. Calleja from bringing suit against any party other than the Home Depot for patent infringement or other violation of the intellectual property or other rights of B&O and/or Michael J. Calleja. No amendment shall be valid unless in writing and signed by a duly authorized representative of each party.

4. Venue and Controlling Law. In the event of any litigation between the parties arising out of this Memorandum, the Parties agree that any litigation shall be brought in the United States District Court for the Northern District of California, and nowhere else. The Parties further agree that this contract is entered into in the State of California, and that the laws of the State of California, except those laws governing conflicts of laws, shall govern.

If you are in agreement with the foregoing, please so indicate by executing a copy of this memorandum and returning one signed copy to the attention of Scott Long, Manager - Procurement. The terms of this memorandum shall become effective when fully executed by the parties.

**Home Depot U.S.A., Inc.**

Scott Long
COE Leader
Date: _____

**B&O Manufacturing, Inc.**

Name: _____
Title: _____
Date: _____



# EXHIBIT 2



January 31, 2006

Mr. David Curley
Procurement Manager
The Home Depot
Atlanta, GA

Re:    Open Balance Refund Agreement

Dave:

This agreement confirms the arrangement between The Home Depot (THD) and B&O Manufacturing, Inc. (B&O) in regards to the refund of $1,780,638.76 as represented by the THD ████████ payment of $1,062,000 for THD purchase order # 9000522338 and the open balance of $727,638.76 from THD purchase order # 9001007483.

Payments to THD will be based on THD's fiscal year, made on a quarterly basis and mailed to THD within twenty (20) days from the quarter close. The schedule below lists the THD quarter end and expected payment date from B&O.

| | |
|---|---|
| April 30, 2006 | May 20, 2006 |
| July 31, 2006 | August 20, 2006 |
| October 31, 2006 | November 20, 2006 |
| January 31, 2007 | February 20, 2007 |

The payment amount will be based on fifty percent (50%) of the payments received by B&O from THD for the representative quarter. An accounting of these payments as well as a copy of the remittance advices from THD will be included with the payment on a quarterly basis. (This will also be emailed to you in Excel format for your records).

By executing below THD & B&O agree to the above agreement and the quarterly refund payment schedule as detailed above.

B&O Manufacturing, Inc.
Michael J. Calleja
President

Date   1/31/06

The Home Depot   U.S.A. Inc.
David J. Curley   Thomas Single
VP - Procurement Manager

Date   2-1-06

APPROVED LEGAL

EXHIBIT 3

## EXPENSE BUYING AGREEMENT – SAFETY NETTING

This non-exclusive EXPENSE BUYING AGREEMENT FOR SERVICES AND PRODUCTS is entered into as of April 1, 2006 ("**Effective Date**") through March 31, 2008, by **HOME DEPOT U.S.A., INC.**, including its affiliates, a Delaware corporation, with its principal place of business located at 2455 Paces Ferry Road, NW, Atlanta, GA 30339 ("**Home Depot**") and **B&O Manufacturing Inc.**, a corporation, with offices located at 245 East Harris Ave, South San Francisco, CA 94080 ("**Supplier**"). This Expense Buying Agreement is an integrated agreement consisting of these terms and conditions, the Expense Reference Guide, and the attached Expense Buying Agreement Forms (collectively, the "**Agreement**").

The parties, intending to be legally bound, agree as follows:

### 1.0 Scope of Work.

#### 1.1 Services and Product.
(a) Contractor shall provide Product (defined below) equipment, tools, and labor to perform the Services set forth in Exhibit A (attached hereto and incorporated by reference as if fully set forth herein) that identifies tasks to be performed, deliverables, schedules for performance, fees and expenses, and locations for performance of services (hereinafter "**Services**"). Services may also be set forth in a stand-alone Exhibit/Scope of Work document or included within a purchase order issued to the Contractor after the Effective Date, each of which shall be considered an "Exhibit" under this Agreement.

(b) All goods provided by Contractor, that are (i) manufactured goods through the regular business of Contractor or a third party; or (ii) custom created, developed and manufactured or otherwise produced for Home Depot that are purchased under this Agreement shall be considered product (hereinafter "**Products**") All Product purchases shall be billed to Home Depot at cost with no mark-up by Contractor. An Exhibit shall specify the Product to be purchased.

#### 1.2 Additional Services and Products.
For additional Services or Products including the addition of locations not included in Exhibit A-1 ("**Additional Services and Products**"), Home Depot shall issue to Contractor a separate "Exhibit A-_" to be numbered consecutively (*e.g.*, "Exhibit A-2, A-3, A-4, etc.") and to be in a form substantially similar to Exhibit A-1 ("**Exhibit(s)**"). Additional Services and Products may also be set forth in a stand-alone Exhibit/Scope of Work document or included within a purchase order issued to the Contractor after the Effective Date, each of which shall be considered and "Exhibit" under this Agreement. Exhibits shall be incorporated into this Agreement by reference as if fully set forth herein.

#### 1.3 Precedence.
In the event of an inconsistency between the terms and conditions of this Agreement and any Exhibit attached hereto, the terms and conditions of this Agreement shall govern and control, except as otherwise expressly amended in an Exhibit.

### 2.0 Compliance.
#### 2.1 Home Depot Safety Requirements.
Whenever on Home Depot' property, Contractor shall comply with all Home Depot policies and procedures governing on-site work, including, without limitation, Home Depot's safety, security, and data protection policies and procedures. At Home Depot' request and expense, Contractor shall attend Home Depot training sessions regarding Home Depot's on-site rules of behavior, work schedule, safety, security, data protection policies and procedures, and such other Home Depot policies and procedures as Home Depot may deem applicable. Contractor shall communicate these policies and procedures to all employees, agents, and subcontractors, if any, who will be present at any Home Depot property on behalf of Contractor (collectively, "**Staff**"). A copy of Home Depot's Safety Procedures is attached hereto as Exhibit B, and is an integral part of this Agreement.

#### 2.2 Environmental Compliance.
Contractor agrees to comply with all applicable environmental laws and regulations, including laws governing the safe handling and disposal of hazardous materials, oil products and waste, in fulfilling its responsibilities under this Agreement. Contractor also agrees to use its best management practices so as to fulfill its obligations under this Agreement in as environmentally sound and energy conserving manner as reasonably possible. Contractor shall use commercially reasonable efforts to undertake, the specific practices described herein.

#### 2.3 On-Site Service Provider Standards.
Home Depot is a "drug free" workplace. Prior to permitting their Staff to provide Services on any Home Depot property, Contractor, at their expense must require their Staff to submit to and pass a background screening conducted by an independent agency and pursuant to Home Depot's On-Site Service Provider Standards, attached hereto as Exhibit C, subject to the requirements and/or limitations of applicable law. Under no circumstances shall the Contractor permit any of their Staff to provide Services at any Home Depot facility, if Contractor's Staff has not met these requirements. Contractor must also ensure that their Staff has successfully passed a drug screen profile prior to providing Services at any Home Depot facility, subject to the requirements and/or limitations of applicable law.

### 3.0 Term
#### 3.1 Term and Termination.
The term of this Agreement shall commence on the Effective Date and shall continue in effect for a two-year period or until either party terminates the Agreement as follows:

(a) Either party may terminate this Agreement (i) for material failure by the other party to comply with the terms of this Agreement, provided such breach is not cured

within thirty (30) days after written notice of the breach is received from the other party; or (ii) immediately in the event the other party seeks the protection of any bankruptcy court, becomes insolvent, or makes an assignment for the benefit of creditors.

(b) Home Depot may terminate this Agreement without cause, upon sixty (60) days prior written notice to Contractor.

(c) Unless otherwise expressly specified by Home Depot, following delivery of Home Depot' notice of termination of this Agreement, Contractor shall complete any outstanding tasks initiated prior to receiving notice of termination.

(d) Home Depot may terminate any Service, portion of Service, location, or Exhibit without cause with a one-week written fax or email notice to Contractor, without terminating the entire Agreement.

(e) All Exhibits shall be co-terminus with this Expense Buying Agreement, unless specifically noted on the Exhibit.

**3.2   Effect of Termination**.   Upon termination of this Agreement, Contractor shall promptly invoice Home Depot for fees and expenses related to the Services completed in accordance with this Agreement prior to the effective date of termination. Home Depot shall pay undisputed invoices within forty-five (45) days of receipt by Home Depot. Upon payment of such invoices, Home Depot shall have no further payment obligations with regard to this Agreement.

## 4.0 Payment.

**4.1   Fees and Expenses**.   Fees allowed under this Agreement shall be, as set forth in the applicable Exhibit (i) based on time and materials or (ii) a fixed price for Services ("**Fees**"). Expenses allowed under this Agreement shall be as follows: Travel expenses actually incurred where such expenses are pre-approved by Home Depot in writing and a valid receipt is provided for any expense in excess of One Hundred Dollars ($100.00) ("**Expenses**"). Contractor shall be solely responsible for all other expenses incurred in the performance of this Agreement.

**4.2   Invoices and Payment.**   To receive payment, Contractor must submit to Home Depot, within 30 days of performance of Services or delivery of products, an invoice for Fees and Expenses  that includes a Home Depot  Purchase Order Number ("**Valid Invoice**"). All invoices submitted by Contractors shall be paid by Home Depot within forty-five days of Home Depot's receipt of invoice.  Each invoice shall include a Purchase Order number, address where services are performed, description of services rendered and the total cost due to Contractor.

**4.3   Pricing.**   Contractor agrees not to treat any retailer customer, including Home Depot's affiliates and subsidiaries, better than Home Depot, and further agrees that Home Depot will be afforded prices, warranties, benefits and other terms that are no less favorable than those offered to Contractor's competing retailer customers

**4.4   Taxes.**   Home Depot shall pay any federal, state, and local sales or use tax for materials and labor imposed on the delivery of Services, except for taxes based on Contractor's income. If Home Depot pays any tax that is later held to not be due, Contractor shall promptly refund to Home Depot the amount of taxes paid together with interest on such refunded amount at the rate of one and one-half percent (1.5%) per month compounded monthly or the highest lawful interest rate, whichever is less, from the date of payment by Home Depot.

**4.5   Review of Records**. For a period of three (3) years from the date of completion of Services, Contractor shall maintain accurate books and records associated with the Services, including without limitation, timesheets, work specifications, invoices, and receipts ("**Records**"). Upon ten (10) days prior notice from Home Depot to Contractor, Home Depot or its representatives shall have the right to review Records.  Such reviews shall be conducted at mutually-convenient times, during Contractor's normal business hours and in a manner that does not materially disrupt Contractor's business operations. If such review reveals that Contractor has over-charged Home Depot, Home Depot shall notify Contractor of the amount of such over-charge and Contractor shall promptly pay to Home Depot the amount of the over-charge plus interest. Interest shall be calculated at a rate of one and one-half percent (1.5%) per month, compounded monthly, or the highest lawful interest rate, whichever is less, from the date of payment to Home Depot. In the event that over-charges exceed five percent (5%) of the agreed upon fees in an Exhibit, Contractor shall pay to Home Depot any reasonable costs and expenses incurred to conduct the review.     .

## 5.0 Confidential Information.

**5.1   Confidential Information.** A party hereto may disclose or make available ("**Disclosing Party")** to the other party ("**Receiving Party**"), whether orally or in tangible form, confidential or proprietary information concerning the Disclosing Party or its business, products or services, including the terms and conditions of this Agreement (collectively, "**Confidential Information**"). Each party agrees that during the term of this Agreement and thereafter (i) it will use Confidential Information belonging to the Disclosing Party solely for the purpose(s) of this Agreement, and (ii) it will take all reasonable precautions to ensure that it does not disclose Confidential Information belonging to the Disclosing Party to any third party (other than the Receiving Party's employees or professional advisors on a need-to-know basis who are bound by obligations of nondisclosure and limited use at

least as stringent as those contained herein) without first obtaining the Disclosing Party's prior written consent. The Receiving Party is responsible for any breach of the confidentiality provisions of this Agreement by its employees or professional advisors. Upon request by the Disclosing Party, the Receiving Party shall return all copies of any Confidential Information to the Disclosing Party. For Confidential Information that does not constitute "trade secrets" under applicable law, these confidentiality obligations shall expire three (3) years after the termination or expiration of this Agreement.   Contractor shall under no circumstances disclose Confidential Information of Home Depot to (i) any businesses that provide the same or similar products or services as Home Depot or (ii) third parties, including, without limitation, business consultants, providing services to such businesses.

**5.2 Exceptions.** For purposes hereof, Confidential Information shall not include any information that the Receiving Party can establish by convincing written evidence (i) was independently developed by the Receiving Party without use of or reference to any Confidential Information belonging to the Disclosing Party; (ii) was acquired by the Receiving Party from a third party having the legal right to furnish same to the Receiving Party; or (iii) was at the time in question, whether at disclosure or thereafter, generally known by or available to the public through no fault of the Receiving Party. All work product resulting from work performed by or through Contractor shall be deemed to be Home Depot' Confidential Information.

**5.3 Exclusion.** These confidentiality obligations will not restrict any disclosure required by order of a court or any governmental agency, provided that the Receiving Party (i) gives prompt notice to the Disclosing Party of any such order prior to disclosure such that the Disclosing Party can seek protection from disclosure, (ii) makes diligent efforts to limit disclosure, and (iii) reasonably cooperates with the Disclosing Party at the Disclosing Party's request and expense to resist such order or to obtain a protective order.

**6.0 Representations and Warranties.**
**6.1 Service Warranties.**   Contractor represents and warrants that: (a) Contractor is financially solvent and has the ability to perform its obligations hereunder; (b) Contractor has not entered into and will not enter into any other agreement that conflicts with this Agreement or limits Contractor's ability to perform the Services; (c) Contractor will timely obtain all permits and licenses required to perform the Services; (d) the Services will meet the specifications listed in the applicable Exhibit A-#; (e) the Services will be provided by Staff having the appropriate level of skill and training; (f) and (f) Contractor shall perform all Services on time, in a professional and

workmanlike manner, in accordance with industry standards, and in compliance with all applicable federal, state and local laws, ordinances, by-laws, rules, and regulations.

**6.2   Product Warranties.**   Contractor represents and warrants that the Products furnished under this Agreement shall conform and comply with all applicable international, federal, state and local laws, ordinances, codes, rules, and regulations (collectively, the **"Laws"**) including, without limitation, (a) lawful pricing and other terms and conditions of sale;   (b) lawful guarantees, warranties, labels, and instructions furnished in connection with the goods; (c) lawful true and correct weights, measures, signs, legends, words, particulars, or descriptions, if any, stamped, printed, or otherwise attached to the goods or containers or referring to the goods delivered hereunder; (d) non-infringement of any actual or alleged patent, design, trade name, trademark, copyright, trade secret or other intellectual property right; (e) being free from defects; (f) being of good quality, material, and workmanship; (g) being merchantable and fit for the intended purpose; (h) conforming to all applicable specifications, requirements and samples; and (i) having good and marketable title. All warranties, whether express or implied, shall survive inspection, testing, installation, acceptance, payment, and use by Home Depot.

**6.3 Immigration Laws.** Contractor shall ensure that all Staff are in compliance with all applicable laws, regulations, and government policies and requirements relating to immigration ("**Immigration Laws**") and that they are legally able to perform the Services. Specifically, without limitation, Contractor shall comply fully with the record keeping and other requirements of the Immigration Laws. Home Depot is not responsible for sponsorship of any workers who perform Services on behalf of Contractor.

**7.0 Indemnification and Product Liability.** Contractor ("**Indemnitor**") shall indemnify, defend, and hold harmless Home Depot, its affiliates, subsidiaries, officers, employees, and agents ("**Indemnitees**") from and against any and all claims, lawsuits, judgments, losses, product recalls, and civil penalties for actions, liabilities, damages, costs, and expenses, including attorney's fees and court costs, arising out of or related to (a) the death or injury to any person or damage to any property caused by any act or omission of Indemnitor, the Product or Services, or use of the Product or Services; (b) the failure of Indemnitor or Product to comply with any warranty, guarantee, or representation pertaining to the Product or Services; (c) any guarantee, warranty, label, or instruction furnished by Indemnitor; or (d) any infringement of any patent, design, trade name, trademark, copyright, trade secret, or other intellectual property right;   or (e) the Indemnitor's negligence. willful misconduct, or breach of any

representation, warranty, or other obligation under this Agreement, including, without limitation, compliance with Immigration Laws; or (f) any and all liens, including, without limitation, construction, laborer's, materialman's, mechanic's, or any other lien arising from Indemnitor's performance of the Services; or (g) any claim or lawsuit filed against Home Depot by any Staff of Indemnitor (i) seeking benefits due to employees of Home Depot by virtue of their engagement, (ii) resulting from any claim that an independent sub-contractor of Indemnitor is not an independent contractor, (iii) that any current or former employee is not, or was not, an employee of Indemnitor, or (iv) termination for any reason whatsoever by Indemnitor; or (h) Indemnitor's failure to be in compliance with any governmental agency's regulatory requirements for the Indemnitor or it's Staff including any immigration laws; The Indemnitees will give prompt notice of any such claim to the Indemnitor, and the Indemnitor will defend the Indemnitees at the Indemnitees' request.

Home Depot, at its expense, shall have the right to participate in the handling of matters arising hereunder. If Contractor fails to assume its obligations hereunder within a reasonable time, Home Depot shall have the right to proceed on Home Depot's own behalf to defend itself. Contractor shall indemnify Home Depot for any and all costs and expenses, including attorney's fees and court costs, in connection therewith.

## 8.0 Insurance; Bonds.
**8.1    Required Coverage.**    During the term of this Agreement, including any applicable warranty period, Contractor agrees to maintain, at Contractor's sole cost and expense, the following insurance coverage: (a) Worker's Compensation Insurance to the full extent required by the laws of the states or jurisdictions in which the services are being performed; (b) Employers Liability Insurance with limits of not less than $1,000,000 per employee per accident; (c) Contractor shall maintain Commercial General Liability Insurance, including Products Liability and Completed Operations coverages, on an occurrence basis with limits of $2,000,000 for property damage and bodily injury or death. All insurance must be written by a US insurance company which is rated in Best's Key Rating guide (Property Casualty edition) as A-VIII or better. Contractor shall maintain a Broad Form Contractor's Endorsement in said insurance policy with Home Depot named as an additional insured and requiring that Contractor's insurance be the primary policy with respect to any loss hereunder; (d) Automobile Liability Insurance covering use of all owned, non-owned and hired vehicles, with a minimum combined single limit of liability for bodily injury (including, without limitation, death) and property damage of not less than $1,000,000 per occurrence and if applicable (e) Contractors Pollution Liability: $1,000,000 per loss/$2,000,000 annual aggregate (occurrence form).

**8.2    Certificate of Insurance.** Upon execution of this Agreement, Contractor shall provide Home Depot with a certificate of insurance ("COI") identifying the coverage required hereunder and naming Home Depot as an additional insured. In addition, the COI shall be endorsed to provide Home Depot with at least 30 days prior written notice in the event of any proposed cancellation or modification affecting Home Depot' rights under the insurance policies at issue.

**8.3 Bonds.** Home Depot shall have the option to require Contractor and/or its Staff to be bonded.

**8.4 Additional Terms.** All insurance must be placed with insurers having a Best's rating of "A 10" or better. The fact that Contractor has obtained the insurance required in this Agreement shall in no manner reduce or otherwise affect Contractor's obligations or liabilities under this Agreement.

**9.0 Independent Contractor.** The status of Contractor shall be that of independent contractor. Neither Contractor nor Staff shall be deemed employees, agents, or contractors of Home Depot. None of the terms set forth in this Agreement will be construed as creating a partnership, joint venture, agency, master-servant, employment, trust, or any other relationship between Home Depot and Contractor or Staff. Contractor and Staff are not eligible for, nor may they participate in, any employee benefit plans of Home Depot. Contractor is solely responsible for paying any and all salaries, fees, benefits, taxes (including, without limitation, social security and income), and any other applicable statutory deductions required by law pertaining to Staff. To the maximum extent allowed by law, Contractor shall indemnify, defend, and hold harmless Home Depot and its parent, affiliates, subsidiaries, directors, officers, employees, and agents from and against any and all claims, penalties, interest, damages, suits, fees, judgments, liabilities, costs and expenses, including without limitation, attorneys' fees and court costs, arising out of or in connection with (a) any re-characterization of Contractor or Staff as an employee of Home Depot for tax purposes; (b) Contractor's failure to pay taxes or contributions; or (c) Contractor's failure to file required tax forms.

**10.0 Subcontracting.** Contractor may not, without providing prior notice to Home Depot, subcontract any of the Services provided to Home Depot under this Agreement. If Home Depot consents to any such sub-contracting: (a) Each independent sub-contractor must have a written agreement between the Contractor and the independent sub-contractor to include provisions of confidentiality, insurance, representations and warranties and Safety Standards, as set forth in Exhibit B, that are no less stringent than those in this Agreement between Contractor and Home Depot; (b) Contractor shall exercise

appropriate supervision of sub-contractors and shall be solely responsible for the payment of any compensation and the payment or non-payment of any payroll taxes, unemployment insurance, social security, worker's compensation, pensions or annuities which are imposed with respect to payments of compensation from Home Depot to Contractor hereunder.

**11.0 Assignment.** Contractor shall not assign any of its rights, interests or obligations under this Agreement, without Home Depot' prior written consent. Any such assignment or delegation without Home Depot' consent shall be deemed void and of no effect.

**12.0 Use of Name and Publicity.** Contractor shall not, and shall ensure that its subcontractors shall not, make any disclosures concerning the commercial relationship between Contractor and Home Depot without Home Depot's prior written consent. Further, Contractor shall have no right to use, in any manner whatsoever, the name, logos, trademarks, trade names, service marks, or other marks of Home Depot (collectively, "**Marks**"), without prior written consent from Home Depot, which consent shall be at Home Depot' absolute discretion. If consent is granted, use shall be limited to the time and manner expressly granted in writing to Home Depot. In the event of a breach of this section by Contractor or its subcontractors, Home Depot shall have the right, at its option to do one or more of the following:  (i) issue a retraction in the name, and on behalf of Contractor; (ii) require Contractor to issue a retraction; or, (iii) terminate all or any part of this Agreement without further liability. Breach of this provision by Contractor shall be considered a material breach of this Agreement and Home Depot may terminate this Agreement immediately upon delivery of notice to Contractor and without further liability to it.

**13.0 Notices.** Except for notices to terminate an Exhibit which shall be by fax or email, all notices permitted or required to be given under this Agreement shall be deemed sufficient if given by first class United States mail, postage prepaid and return receipt requested or by a nationally recognized courier service, and addressed as shown below.

If to Home Depot:

Home Depot U.S.A., Inc.
Procurement, D-19
2455 Paces Ferry Road NW
Atlanta, GA  30339

With a copy to :

Home Depot U.S.A., Inc.
Legal Dept., Contracts Manager C-20
2455 Paces Ferry Road NW

Atlanta, Georgia 30339
Attn:  Contracts Manager

If to Contractor:

_____

_____

_____

Attn: _____

**14.0 Changes and Modifications.** The terms and conditions of this Agreement and Exhibits hereto may not be amended, waived, or modified, except in a writing signed by both parties.

**15.0 Severability.** In the event that any provision of this Agreement is held invalid or unenforceable in any circumstances by a court of competent jurisdiction, the remainder of this Agreement, and the application of such provision in any other circumstances, will not be affected thereby.

**16.0 Governing Law.** This Agreement will be governed by and construed and enforced in accordance with the laws of the State of Georgia, except for its conflicts of laws rules. The parties agree that the courts in the State of Georgia shall have exclusive jurisdiction over any disputes under or relating to this Agreement.

**17.0 Dispute Resolution.** Except injunctive or other equitable relief, Contractor and Home Depot agree that, as a condition precedent to the institution of any action regarding disputes arising under or in connection with this Agreement, such disputes shall first be submitted to mediation before a professional mediator selected by the parties. Such mediation shall be conducted at a mutually agreed time and place, and the mediator's fees shall be split equally between the parties. If mediation is unsuccessful, the parties shall submit disputes to either the US District Court for the Northern District of Georgia, Atlanta Division, or the Superior Court of Cobb County, Georgia.

**18.0 Cooperation With Other Contractors.** Contractor will reasonably cooperate with other contractors and consultants working on projects for Home Depot as may reasonably be required by Home Depot.

19.0 <u>Negotiated Terms</u>. The language, terms, conditions, and provisions of this Agreement are the result of negotiations between the parties and this Agreement will not be construed in favor of or against any party by reason of the extent to which any party or its professional advisors participated in the preparation of this Agreement or based on a party's undertaking of an obligation under this Agreement.

20.0 <u>Disclaimer/Exclusion of Damages; Limitation of Liability; Remedies and Waiver</u>.
a. <u>LIMITATION OF LIABILITY</u>. NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, PUNITIVE DAMAGES, OR LOST PROFITS, EVEN IF SUCH DAMAGES WERE FORESEEABLE, PROVIDED THAT THE LIMITATIONS OF LIABILITY, EXCLUSIVE REMEDIES AND RECOVERABLE DAMAGES IN THIS AGREEMENT WILL APPLY TO CLAIMS, LOSSES OR DAMAGES ARISING IN CONNECTION WITH INDEMNIFICATION OBLIGATIONS, GROSS NEGLIGENCE, WILLFUL MISCONDUCT, BREACH OF CONFIDENTIALITY OR NON-COMPLIANCE WITH LAWS OR OTHER GOVERNMENT REQUIREMENTS.

b. <u>Remedies and Waiver</u>. The remedies specified in this Agreement are cumulative and are in addition to any remedies available at law or in equity, except as otherwise set forth in this Agreement. No term or condition of the Agreement shall be waived or construed to be waived by either party unless such waiver is in writing and signed by an authorized agent of the waiving party. No acceptance of full or partial performance during the continuance of a breach shall constitute a waiver of the right to demand strict performance. No custom or practice of the parties at variance with the terms hereof shall constitute a waiver of the right to demand strict performance. Waiver of a breach of any provision of this Agreement does not constitute a waiver of any other breach of the same provision or any other provision of this Agreement.

21.0 <u>Non-Solicitation</u>. Contractor shall not, directly or indirectly, during the term of this Agreement and for a period of twelve (12) months after the effective date of termination of this Agreement, recruit, or attempt to recruit, discuss employment with, in any capacity of any person who is or was an employee or contractor of Home Depot during the term of this Agreement. In the event of breach of this provision by Contractor, Contractor shall pay to Home Depot, as liquidated damages and not as a penalty, an amount equal to two times the salary of the Home Depot employee so recruited at the time of that employee's departure from Home Depot.

22.0 <u>Work Product</u>.

22.1 <b>Work Product</b>. All work performed, deliverable, or product produced in whole or in part by Contractor under or related to this Agreement shall be deemed "Work Product". Unless otherwise specifically stated on a Statement of Work. within sixty (60) days from receipt of any Work Product, Company will provide Contractor with a reasonably detailed written description of any objections relative to such Work Product. Contractor and Home Depot will review the objections, and Contractor will expeditiously provide Home Depot with revised Work Product that meets the requirements of the Services defined in the Exhibit(s) under which it was prepared, at no additional cost to Home Depot within the time period specified by Home Depot. Home Depot will be deemed to have accepted any Work Product if Home Depot does not provide Contractor with written notice of objections within such sixty (60) day period. If Contractor fails to correct the defects within the specified period, Home Depot may, at its option: (i) allow Contractor additional time to correct the defects; or (ii) terminate the Services defined in the Exhibit(s), in whole or in part, and receive a refund from Contractor for any monies paid. In no event will use of the Work Product by Home Depot during acceptance testing or otherwise be deemed acceptance of the Work Product prior to expiration of the testing period

22.2 <b>Ownership of Work Product</b>. Unless otherwise provided in an Exhibit, Contractor hereby assigns to Home Depot all worldwide right, title, and interest in and to all Work Product, including all intellectual property rights thereto, produced in whole or in part by Contractor under or related to this Agreement, whether or not patentable or copyrightable, and such Work Product is deemed "work made for hire" to the extent allowed under the U.S. Copyright Act. Contractor will take such further actions as may be appropriate to give full and proper effect to this assignment without the need for any further compensation beyond that provided for in this Agreement or in an applicable Statement of Work. Home Depot will have the <u><b>exclusive</b></u> unlimited right to make, have made, use, reconstruct, modify, reproduce, publish, distribute, license, and sell the Work Product, in whole or in part, with no license to such Work Product being granted to or retained by Contractor. To the extent that the Work Product contains any knowledge, processes, methodologies, formats or other types of intellectual property that are possessed and owned by Contractor at the time it begins to provide Services under this Agreement ("Contractor's Knowledge"), Contractor must notify Home Depot in writing of the specific Contractor Knowledge and hereby grants to Home Depot a non-exclusive, irrevocable, worldwide, transferable license to use Contractor's Knowledge as Home Depot deems necessary to make full use of the Work Product as allowed under this Agreement.

## 23.0 Computer System Access

**23.1     Access.** From time to time, Home Depot will provide access for its Contractors to proprietary computer systems and technologies owned and operated by Home Depot and/or its parent and affiliated companies to facilitate e-commerce and business-to-business (B2B) transactions (the "Systems"). The Systems are to be used only for the business purposes of Home Depot. Home Depot may periodically monitor all uses of the Systems as allowed by law and review user access records maintained by the Contractor. Contractor's users shall have no expectation of privacy when using the Systems. In order to receive such access, Contractor agrees to the following:

**23.2     Contractor Responsibility.** Contractor will have or promptly create internal security policies that, at a minimum, comply with this section and common industry standards and protect the integrity of the Systems. The Systems must at all times be protected from unauthorized use, theft, misuse, accidental or unauthorized modification, disclosure, transfer or destruction. Anyone who has been convicted of any felony, or a misdemeanor offense related to computers, theft, or information security, will not be allowed to serve as an authorized user for access to any Systems. Home Depot reserves the right to refuse Systems access of any individual convicted of any felony, or misdemeanor offense.

**23.3     Grant of Limited Access.** Home Depot hereby grants Contractor limited, non-transferable access to certain Systems as may be determined by Home Depot from time to time in its sole discretion. The Contractor accepts the liability of managing their users' access to the Systems as outlined in this Section. Each employee, agent or subcontractor of Contractor having access to the Systems will: (i) be assigned a separate User ID by Contractor and will use only that ID when logging on to the Systems; (ii) log off the Systems immediately upon completion of each session of service; (iii) not allow unauthorized individuals to access the Systems; (iv) keep strictly confidential the User ID and password and all other information that enables such access; (v) not reuse a compromised password (e.g. a password that has become known to anyone else at any time, including in an emergency); (vi) only utilize such access to perform its obligations to Home Depot; (vii) comply with Home Depot's encryption requirements or other service policies instituted by Home Depot from time to time; (viii) not perform any unauthorized exploring or mining of the Systems; and (ix) only have access to the portion of the Systems necessary to perform the Contractor's obligations. Contractor is solely responsible for obtaining the hardware and software necessary to properly access the Systems.

**23.4     Notification of Violations.** If Contractor discovers or is notified of a breach or potential breach of security relating to any Systems Information, the Systems, or any applicable law, the Contractor will (i) promptly notify Home Depot of such breach or potential breach and (ii) if the applicable Information was in the possession of Contractor at the time of such breach or potential breach, Contractor, with Home Depot's consent, shall (a) investigate and use its commercially reasonable efforts to mitigate the effects of the breach or potential breach and (b) provide Home Depot with assurance reasonably satisfactory to Home Depot that such breach or potential breach will not recur. No independent action to correct a security issue should be taken unless failure to immediately respond will result in irreparable harm to Contractor or Home Depot.

**23.5     Viruses and Disabling Code.** Contractor will not introduce any viruses, time or logic bombs, Trojan horses, worms, timers, clocks, back doors, or other computer instructions, devices, or techniques that erase data or programming, infect, disrupt, damage, disable, or shut down the Systems or any component of the Systems, including, without limitation, its security or user data. In the event a virus or similar item is found to have been introduced into the Systems by Contractor, Contractor shall, at its sole cost and expense, (i) report it immediately to the Contractor administrator who will in turn report it to Home Depot, (ii) use commercially reasonable efforts to reduce or eliminate the effects of the virus or similar item and, (c) if the virus or similar item causes a loss of operational efficiency or loss of data, mitigate and restore such losses. Furthermore, Contractor employees, agents, or subcontractors may not transfer personal or data files or software to the Systems, including software that is in the public domain (e.g. shareware or freeware) as this may introduce a virus or other malicious code into the Systems.

**23.6     Ownership of Systems and Systems Information.** Except as otherwise expressly provided herein, Home Depot retains all right, title and interest in and to the Systems and any data or information contained therein, including derivatives thereof ("Systems Information").

**23.7     Return or Destruction of Information.** Upon termination of the Agreement or upon Home Depot's request, Contractor will promptly return to Home Depot all tangible items containing any Systems Information, including all copies, abstractions and compilations thereof, without retaining any copies of the items required to be returned. Contractor will certify in writing that it has fulfilled its obligations under this section following return of data or information to Home Depot.

**23.8 Contractor's Employees, Agents and Subcontractors Bound.** The obligations of this Agreement extend to the employees and approved agents or subcontractors of Contractor, and Contractor shall inform such persons of their obligations hereunder.

**24.0 Headings.** The headings of sections of this Agreement are for convenience of reference only and will not affect the meaning or interpretation of this Agreement in any way.

**25.0 Survival.** The sections of this Agreement that by their nature are intended to survive its expiration or termination ("**Sections**"), include, without limitation, Sections 3, 4, 5, 6, 7, 8, 9, 11, 12, 15, 16, 20, 21, 22, 23 and this Section 25. These Sections shall survive the expiration or termination of this Agreement.

**26.0 Force Majeure.** If a party is unable to perform or is delayed in the performance of its obligations due to acts of God, natural weather disasters, fire, explosion, flood, war, civil disturbance, terrorism, or any other cause beyond that party's control (each a "Force Majeure"), such nonperformance shall not be an event of default under this Agreement. In the event of a Force Majeure, the non-performing party shall give the other party prompt written notice describing the particulars of the Force Majeure and the potential duration of the interruption of performance; the excuse of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure; and the non-performing party shall use all reasonable efforts to remedy its inability to perform and the performance shall be resumed at the earliest practicable time after cessation of such interruption.

**27.0    Audit.** To ensure compliance with the terms of this Agreement, Home Depot will have the right, at its own expense, to inspect and audit facilities, processes and systems that are relevant to compliance with this Agreement. All audits authorized under this Section will be conducted during regular business hours in such a manner as not to interfere with normal business activities. This provision shall allow Home Depot or any third party acting on behalf of Home Depot to perform the audit

**28.0 Electronic Delivery.** Contractor, by executing and delivering this Agreement to Home Depot, represents and warrants to Home Depot that this Agreement has not been altered or modified in any manner whatsoever from the version that Home Depot delivered to Contractor for execution.

**29.0 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which when taken together shall constitute the same Agreement.

**30.0    Entire Agreement.** This Agreement. including Exhibits, constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes any and all prior or contemporaneous agreements, understandings, negotiations, represent-tations or proposals or any kind, whether written, oral or

otherwise. Neither party has relied upon any statements, representations or other communications that are not contained in this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement.

**HOME DEPOT U.S.A., INC.**

Signature: _____

Printed Name: Kevin Smith

Title: Vice President, Capital Procurement

Date: 6/6/2006

**SUPPLIER**

Signature: _____

Printed Name: Michael Calleja

Title: President

Date: _____



# EXHIBIT A-1

Pursuant to the Expense Buying Agreement ("EBA") between **Home Depot U.S.A., Inc.** ("Home Depot") and **B&O Manufacturing Inc.** ("Supplier"), Home Depot has authorized and Supplier will provide to Home Depot the Services and Products set forth in this Exhibit A-1. Home Depot and Supplier acknowledge and agree that: (a) the terms and conditions of the EBA are incorporated herein by reference; (b) this Exhibit A-1 will be deemed an addendum to and part of the EBA; and (c) in the event of any conflict or discrepancy between the terms or provisions of the EBA and this Exhibit A-1, this Exhibit A-1 shall control and govern.

## I.    DESCRIPTION OF SUPPLIES/PRODUCTS

Redacted

# Redacted

## II.    <u>DELIVERY DUE DATE</u>

As issued on the Purchase Order

## III.    <u>VOLUME COMMITMENT</u>

Volume commitment only applies to 75% of the new store safety netting within the dates specified above. Other items listed in this exhibit are for pricing purposes only.